Smith, K4-17-0593, Brandon Boston v. Brianne Eichen. Counsel, could you identify yourselves for the record, please? Thank you. Okay. And Ms. Quigo, you represent the appellant, correct? And Ms. Smith, the appellate, correct? All right. Ms. Quigo, are you ready to proceed? You may. May it please the Court? Counsel. Counsel. My name is Brittany King-Twego, and I'm with Barbara Sabato-Hoffey, Wilkie, and Kate, and I represent the appellant, the mother, Brianne Eichen, in this case. And, Your Honors, when I think of this case, unreasonable is the word that comes to mind. And as I continue to read and reread the trial court's ruling, it becomes more apparent that that ruling was unreasonable in this case. And it's unreasonable because what the trial court's decision means for this case, as well as future cases, is that if you are for things, you're a good parent, you don't have to be a great parent. In this case, we don't dispute that Mr. Boston was a good parent. He exercised most of his parenting time. He went to games with a child. But yet he went to some of the practices, a couple doctor's appointments, never really stayed home with the child when he was sick, went to a couple school activities. Again, this is a good parent. This is not where you hear an exceptional parent. And if the child has a good relationship with extended family, again, based on the court's ruling, it doesn't have to be great. They don't have to be overly involved. In this case, it was testified to that the children or the child saw the extended family of Mr. Boston just on weekends when he saw the child, when he had the child for parenting time, occasionally went to a grandparent's day or a concert or a game, but that was only a few times a year. So nothing special about that relationship there. A third thing, if the travel's much beyond 50 miles, the 50-mile rate is for a relocation, what the trial court's ruling is saying, you know, that's going to require too much travel. It's going to be too much travel. And then fourth, if the child participates in extracurricular activities whatsoever. If these four things are present, no parent, no custodial parent will ever get to remove the child, oh, I'm sorry, relocate the child. It doesn't matter how legitimate the reason for relocating or how great of a parent the custodial parent is, where in this case, I find it was very compelling, the reasons for wanting to move. It began with the husband having an offer of a position in Iowa where he would be making substantially more money. And not just that, it was the guarantee of income. He was running a business. He had a salary of about 37 and was running a business. The income was not guaranteed. He had this opportunity not just for himself, but for his family. Also, the hours, he was going from 80 hours to 40 hours. He was out in the field when he was in Illinois, where there he was in a more of a management position. And then it kind of snowballed into, at the time of trial, he had already moved there. So my client's desire then turned to not just wanting to be there with her husband, because I know the Fourth District has discussed that just wanting to be with a spouse isn't enough. But there was a lot more here. My client and her spouse had a child together, a very young child, a four-month-old at the time of the trial. Her wanting to be there, she wanted to have her husband's child and her husband to have this relationship, have a close relationship, have an intact family. For her not to stay in Illinois and have to be a single parent when she's married, and issue, Trey, but the child with her husband, and not just the child with her husband, they had discussed they want to have more children together. This makes their marriage very complicated, because what mother wants to have more children with her husband if she's stuck as a single parent in Illinois? Just so that I get a sense of where you're focusing your argument. Here, your criticism isn't as to the trial court's analysis from the standpoint of it failing to engage in the appropriate analysis, I take it. In other words, you agree that the trial court focused on the correct statutory factors here. Correct. Is that right? Yes. And is it your argument that the trial court actually weighed those factors? In other words, it actually considered each of the factors. Putting aside what criticism you might have of the trial court in not identifying the weight attached to each of those factors. Is that correct? Yes, I believe that she considered all the factors. And obviously, if you go through her ruling, yes, she did. And I know case law states that the trial court doesn't necessarily have to say who it favored or who it gives weight to. However, Your Honor, what issue I have is when the trial court is discussing the factors and makes inappropriate considerations with regard to those factors. Specifically, I know the seventh factor. When it discussed, and I apologize, it wasn't the seventh factor. The third factor, when it discussed the history and quality of each parent's relationship with the child, the trial court went through how great of a parent my client was and how if she was deciding decision-making responsibility and parenting time, my client was it. Yet she goes on to say, to discount that somehow by saying, well, yeah, but then there was testimony that he could be a good father if we gave him the opportunity to be. I don't necessarily think that is an appropriate consideration or something that she should consider when the factor states the history and quality of each parent's relationship with the child. Now, that seems to be retrospective as opposed to prospective. Retrospectively, my client did everything for this child. She was involved in every facet of this child's life. And to say that just because Mr. Boston can do it in the future, that somehow weighs against my client in terms of that factor. So I'm not entirely sure if she took that into consideration or when she was deciding if that factor weighed for my client or against her. That is more what I was saying in where I was going with that argument previously. And I was also stating previously that... Ms. Trego, what about the fact that the court found, if this were simply a determination of allocation of majority of decision-making time and allocating majority of parenting time, that would go to the mother? I'm sorry, could you repeat that? What about the fact that the court made a specific finding that if it were determining allocation of the majority of decision-making time and parenting time, it would find for the mother, and yet then concludes that no, that's not going to be the case? I think that's very important, Your Honor, because as you all know, the factors that go into determining decision-making responsibility and parenting time, that includes similar things you look at in a relocation case. You look at the interaction and interrelationship of the child with not just the parents, but extended family as well. And that created an issue because one of the determining factors that the court stated that she relied on was the good relationship with extended family. And also when looking at decision-making responsibility and parenting time, you also look at facilitation. That's big in relocation cases. They talk about, with the seventh factor, whether the trial court is able to fashion a reasonable allocation of parental responsibilities between all parents. When they discuss that factor, very often they look at how the custodial parent has facilitated a relationship between the non-custodial parent and the child in the past. You also look at, with the decision-making and parenting time, putting the needs of the child above your own and that type of thing. So I think that was very telling in her argument and made it kind of confusing as to why the relocation was not allowed. And that kind of snowballs into the fifth factor, which was of particular concern, where she said that Trey's relationship with his extended family is of utmost importance in this case. If you look at what the Fourth District has ruled in the past, specifically with regard to the Ford case, they stated that relationship with extended family is a valid consideration. However, when weighed against other factors, shouldn't prevent removal, especially when the child would not be disadvantaged or harmed, as to make that a determinate factor. She's making this a determinate factor without showing what the Ford case technically says you need to show, is that the child's going to somehow be disadvantaged or harmed by changing this relationship. And I think it's important to note also that we're talking about a four-hour drive. It's not, and in both parties' proposals... Didn't they talk about dividing the distance? Yes, it was the travel they would meet in Peoria, which isn't necessarily splitting it in half. My client's actually driving a substantial amount of the way in Peoria to Auburn. It's about an hour and 20 minutes. But both of the, and I think it's interesting because both of their proposals, Mr. Boston's, if my client was allowed to relocate with the child, and my client's proposal, if she were allowed to relocate, are almost mirror images of one another, where the child would be traveling three weekends a month to visit with Mr. Boston. That's not too much of a difference from what's going on, what was going on before the relocation petition, where he was seen on the weekends about four weekends a month. Sometimes I understand there's five, but mostly four weekends a month. So you're just cutting down one weekend a month. However, the time with Mr. Boston being extended on the holidays, and then in the summer he's getting substantially more time, where in the summer in the past it was going from Friday to Monday, so it was an extra overnight. However, it was meaningless because that extra Monday he was at work and the child was at daycare. So I think the relocation would allow for more meaningful time, and not necessarily more time, I think it probably works out about the same, but I think more meaningful time between the two. And then I also find issue with when the court analyzed Factor 7, being able to fashion a reasonable allocation of parental responsibilities, she had issue with the child traveling three times a month. However, as I just mentioned, both parties' proposals are mere images, traveling three weekends a month. So it seems odd that the tribal court has issue with the child traveling this much. However, the parents who know this child the best say, we don't really find that to be an issue. And in fact, my client has testified that she's taken the trip with him before. He does fine. Like any kid his age, he plays on the iPad the entire time. So that was kind of interesting to me that the tribal court brought up that she thought traveling that many times a month was unreasonable. You commented that the court ruled in advantage. Yes. At the conclusion of the hearing. Yes. Did she read from a prepared statement or notes or what does that mean? I'm young so my memory should be better. But if I recall, I think she would glance down at notes. I can't necessarily say whether that's correct or not. I can't remember. Did she provide a written order after? No. What was done was the order was on the record and then there was just a docketing statement after that just saying she had denied the relocation and that was it. So what we were to rely on was her ruling from the bench. And also with the reasons that if you look at factor two, the reasons why Mr. Boston was objecting to the relocation, the trial court had mentioned the relationship between the two, that he didn't want to change that. And he had stated that it was the inability to attend all of Trey's extracurricular activities. That was one of the reasons he had objected. And the decreasing quality time with Trey. And they tried to make this argument about he's receiving so much less time because there's this travel on the weekends. However, as mentioned in my brief, it's not really that much different of time. He'd be traveling an hour and 20 minutes with the child in the car. The child would be home a couple hours after he would have gotten originally before the relocation. And on Sundays he was losing about 20 minutes. So it wasn't much of a change there. And he tried to argue, and I know both of his witnesses all use the same word, they both said quality time. It changed to the quality time. But the Fourth District has repeatedly said that the time that you have together isn't as important as what you do with that time. And so I think cutting it down a couple hours a week doesn't really make that much of a difference. And I think the trial court kind of jumped on that quality of time. And I think that was inappropriate. And with regard to Factor 4, the educational opportunities for the child at the existing location and at the proposed new location. In the trial court's ruling she talks about how with the proposed move, a lot of them are high school based and that he'll do well anywhere he goes. And that she chose Farmersville in the past for convenience, and he doesn't have special needs so it doesn't matter where he goes. And I think these are a lot of inappropriate considerations that she looked at here. And I guess my overall issue with all this is I think Mr. Boston testified first. And I think he came off as a really nice guy. And I think she felt bad for him. And I think she had decided at that point she was ruling for Mr. Boston. And I think she went through these factors and tried to find a way to get there. That's a pretty bold statement, I think. Clearly the trial court had a difficult decision here. Good parents, good reasons for the move, good reason for not relocating the child. And you make a compelling argument. I'm sure Ms. Schmidt will as well. Your problem is the standard of review. And you're asking us to say that it's clearly apparent the court should have reached the opposite conclusion. Yes, sir. How is that clearly apparent? And you don't have to repeat everything you've said. Is there more, though, for me to latch on to come to that conclusion? Well, I think you have to look at the authority that the court is to follow. And if you look at the authority from the Fourth District, everything she says in this opinion is the opposite of what the Fourth District has said. And what I find, and you also have to find that the opinion was unreasonable. And as I had started in the beginning, I think what this case does makes, I'm sorry, what the ruling does is makes future cases for relocation impossible. Because there was nothing, I didn't hear anything compelling on Mr. Boston's side. And the four things that she really stuck on to, a good parent, a good relationship with extended family, travel, and participation in extracurricular activities, those are four things common, I would say seemingly common in all relocation cases where you're going to be able to say, okay, yeah, good parent. And also, you'll usually be able to say, yeah, the child has a good relationship with extended family. And obviously, if it's a relocation case, they're always going to be traveling outside of 50 miles, so there's going to be something there. And then she also discusses the extracurricular activities. Most children, if not all, participate in extracurricular activities. So what I think is unreasonable about this opinion is it makes every future relocation impossible. Thank you. All right. Thank you, counsel. You'll have time in rebuttal. Ms. Schmidt. May I please report, counsel? We live in a mobile society, there's no question. So why shouldn't Ms. Iken be able to relocate with Trey? That's the reason we're here. If Mr. Boston were an occasional parent or one that had not been involved in every step of this child's life, it would be easier to rubber stamp her request to relocate. But that's not the case here. Despite Ms. King's assertions, Mr. Boston has been involved in every step of this child's life. The trial court noted that. Even Ms. Iken testified to that fact. The parties function together tremendously. They never even had an order. They never went to court. He was involved, and they worked their schedule largely around Ms. Iken's residence. When she moved a little further away and he couldn't exercise midweek visitation, he went to every weekend. Not every other weekend, which is mostly what this court sees. He went to every weekend. He went to every weekend to maintain his significant involvement in this child's life. He saw the child Friday, Saturday, and Sunday. He never went more than four days without seeing this child. He participated in all of his activities. And did Ms. Iken take the child to the doctor more? Of course she did. She had him more during the week, and my client works a full-time job. What's not being said is the fact that she set her own hours, has consistently set her own work hours, and still can set her own work hours. Of course she took the child to the doctor more. That doesn't say that my client didn't. The testimony of my client, and it was conceded, he did take the child to the doctor if he hurt himself on his weekend or if he needed to. Of course you saw to that child's care. But the fact that she saw to more of the regular appointments is a red herring. She had the child more during the week. Same with homework. My client saw to the child's homework when he had homework to do on his time. He didn't always have homework to do on his time, because she had more of the weekdays. That's just the way that the schedule worked out. But to say that he was only a good parent because he only saw him on the weekends is completely ignoring the facts here. You've seen the pictures. If you reviewed the record, he has pictures with his extended family of every activity they've done. The love and the involvement is apparent in those pictures. He was involved in every activity, and to the extent that she was involved more perhaps with school and the doctors, he was involved more with the activities. All of wrestling, which is this boy's favorite sport, was him. All the meets, all the weigh-ins. He coached his baseball team. Let me ask you this question. Unfortunately, these circumstances take situations where parties have worked everything out perfectly well, and it looks like this is one of those cases. They handled this fine until this issue came up. So unfortunately, what happens frequently is each party is trying to show the other person to be worse or not as good as or something to that extent. I have a hunch from reading this record that the judge was in that same situation. So of the factors that she considered, which do you consider to be those that were most significant in the trial court's mind in deciding that this petition should not be allowed? I believe that the presence of family, extended family. I believe the history of involvement of my client and the fact that he exercised not all of his time plus additional time in the summer and saw the child all of the time. I believe that the ability to arrange another schedule was very important. And if I may on that point, a very significant point in this case, which is not present in most of the other cases that I've read, in fact, I can't think of any, is the flexibility of Ms. Eichen. She has, she testified in the trial court issues stated in her ruling, she has the ability to drive midweek. My client doesn't. So she has the ability if the child stays here, and I realize that the justices after what's happened after the fact isn't part of what's before the court today, but if she stays, if the child stays here and the mother moves to Iowa, she has the ability to drive midweek anytime she wants and see the child, still go to doctor's appointments, still go to school functions that are in the evenings. She has family to stay with. That's on the record. She has housing available to her here, no problem. If she stays here, she has the ability to visit with her husband the middle of the week because she sets her own schedule. My client doesn't have that ability. He can't go to anything in the evenings in Iowa. He just can't. I mean, he has to miss work or he can't. It's a four-hour drive. He can't, his family can't attend functions in Iowa the way they can here. The family involvement, everybody on both sides of the families are in town. As one of the witnesses said, just one phone call away. They don't have that in Iowa. Everybody's here. This boy loves his family, sees his family, may see him more on the weekends, but that doesn't mean it's exclusively weekends. All the witnesses testified, the grandmothers especially, were there to assist with transportation, were there to assist if they needed a babysitter. You know, that won't be available in Iowa. So I believe that the family was one important factor and the ability to fashion an alternative by Miss Iken doing more of the driving because she's flexible. I think that factored into the court's ruling. I also believe it was a history of involvement and I believe that Miss Kink minimizes the level of parenting that my client has given to this child. I mean, he's been integrally involved in his life. He's not just been a weekend dad. So I would also like to focus on the standard of review, and it is an abuse of discretion standard. Judge Asher was an experienced trial family law attorney before she took the bench. She listened to this case. We needed an expedited ruling because of the school situation. We needed to know what was going to happen. So she ruled from the bench. She excused herself after the testimony and came back, and I also believe, I think she had some notes, but I don't believe she read from anything. But she issued a decision. She followed every step of 609.2 and considered every single step. You cannot overturn her decision unless you find it to be arbitrary, unreasonable, or against the manifest weight of the evidence. Counsel? Yes, sir. You indicated that it's an abuse of discretion standard, but isn't it? I'm sorry, manifest weight. I apologize. Manifest weight and that it appears a manifest injustice. Yes, sir. There's that add-on there, right? A manifest injustice. A manifest injustice. I don't – are you – I'm sorry. Are you asking if I believe that occurred? No, I'm asking you if you believe that's the standard. Yes, sir. And then the second question would be what evidence of a manifest injustice has been established here? I don't believe, Justice Harrison, there has been any injustice. I think she heard all of the evidence. It's not a good situation for Mother. There's no question. But she put herself, to a certain degree, in this situation when she chose – when they chose to accept a job and get a house before they even raised the issue in the court or with my client. So she just assumed she was going to get to do it. It's an antenna. It's not a good situation for her, but it wouldn't be a good situation for my client. But the focus isn't whether it's a good situation for the parents. The focus is, is it a good situation for the child? And that's what the judge said her responsibility to review. The only case that I have seen that has really focused on the new statute, 609.2, is the second district in-rate parentage of PD. And that case, among any other case that I have seen, has facts that are completely parallel to this. In that case, the mother wanted to remove the child to New Jersey because her current husband had a better job opportunity there. The family, all the extended family was in Illinois. The dad was very involved with the sports and the activities. The trial court denied the removal, and the second district upheld that denial, finding that the trial court did not abuse its discretion and also is talking about the difference between the quality of time versus the quantity of time and how alternate weekends and compressed time in the summer doesn't always replace the continuing contact. Did you cite the in-rate parentage of PD? I did not, Judge. It came down after. It came down in October. It was released in October. It's 2017, ILAP second, 170355. And in that case, just like this case, I think there is a need to look at the economic circumstances and the reason for the removal. Now, there is no standard that says that it has to be absolutely required, but I think all of the cases, PD and the previous cases, look to the fact that when removal is affirmed or a denial is reversed, it's because of economic necessity on the part of the, I'll say mother, because that's typically who it is. In the Ford case that Ms. Hink cited, the situation was the mother was a waitress. She had to work at night, so her child had to be farmed out to other people every night. She had such bad financial situations, she had to live with her parents, and the child didn't have the own room. In that case, it's an economic necessity. There's other cases, I believe it's the Matching case, where the mother exhausted all efforts to find employment here because she lost her job. She found a job elsewhere. She had to move. This isn't that situation. The Itons were fine here. They had a job. They had a nice house. They had cars. The child had his own room. By their own testimony, life was good here. They have an economic betterment by moving to Iowa. But I would submit that an economic betterment is not the same as economic necessity. They didn't have to move. And the fact that they get a bigger house, they get a better community in their mind, doesn't replace the fact that this child, they're wanting to take this child out of his sense of community, his family, everything he knows here. They won't be able to spend as much time with his little brother, who he's described as being inseparable with. It's just, it's not, she didn't have to do this. It would be nice for her, yes. But in the case that the Second District also talked about the fact that the focus, and this is an interesting point that I should have realized when I first read 609.2, but admittedly I didn't. The Eckerd Standard talks about looking at the quality of life of the custodial parent. That was not codified in 609.2. The Second District analyzed that to mean that the legislature was shifting the focus slightly off of that and focusing more just on the best interest and the impact of the life of the child. It's an interesting analysis because they're right. They didn't bring that forward from Eckerd into 609.2. So there's no question that Ms. Eichen believes that her life would be enhanced if there was a move. But that doesn't mean the child's life is going to be enhanced, just because he has a bigger house. So then finally the concurrence in that PD case. Ms. Smith, I have something of a problem with you arguing in rape PD if it hasn't been addressed in the briefing and counsel hasn't had an opportunity to address that here in advance of argument. I apologize, Judge. I thought that it was fair game, too, when they were released before the argument that we were able to argue them. Was there any motion to supplement? No, sir. I apologize if my understanding of the appellate procedure was incorrect. I thought that we were able to argue those decisions. But the factors are still under 609.2. The factors in the case, they have to be considered by the trial judge, and they were considered by the trial judge. She is an experienced judge. She went through every one of those factors. She does not have to assign weight to them. She mentioned them all. And, in fact, the first one where this Eichen argued that she gave improper weight, she didn't assign weight. She doesn't have to assign weight. She considered them all. And for this court to find that it was against the manifest weight of the evidence is just not correct. It dilutes the whole standard of review. It takes away her job. She's the one that got to observe the witnesses. She's the one that heard the testimony. She's the one that saw the tears in the courtroom. She issued her ruling, and this court should not, just because you may or may not have agreed with her, you shouldn't replace your ruling with hers. Thank you. Okay, thank you. Ms. Puig, a rebuttal? Very briefly, thank you. Your Honor, I think there's an issue when counsel begins talking about that economic necessity is required for a relocation. It isn't. What I glean from the cases to which I read is that it's more economic security is what these different custodial parents sought when they moved and what the court found important. And I think we show that, economic security. My client's husband had a job where he had significant accounts receivable. He didn't know when the money was coming in, when it was going out, yet they want to move to Iowa to have financial security in that he has a guaranteed income. He has a salary. He makes $120,000 a year. He knows that each month or each week, whatever the pay increments may be, that there is money coming into the account to support the family. And also in terms of the relationship that Mr. Boston had with this child, I think it's very overstated. I think I used weekend father in the trial court in my argument because I didn't see much that went on with this child that didn't involve the weekend. And they tried to say that father was more involved with the activities, the wrestling and the baseball and the soccer. These meets and these games occurred on weekends. That's why he took them. But the testimony suggested my client was there every step of the way. However, things that happened during the week, the things that aren't as important to people, the practices, that was my client. My client's there for the things that aren't as glamorous as the games and so forth. She's there for every step of the way. And then in terms of the homework, getting the homework done. He testified he did homework maybe one time. One time. This child's in second grade. One time, homework. Ms. Guigo, what is the manifest injustice here? The manifest injustice, I think, is making the reality where this mother has to choose between her husband and her child with her husband or her other son with Mr. Boston. Ms. Smith has indicated this is a situation of her creation. That your client created this situation where she's split between two homes now. Correct. And I would agree with that. And I think the appellate court has addressed this in the past. It says that this argument has been made. That the custodial parent, when they plan to relocate, they're bringing it upon themselves. But that was, if you look back at what the appellate court has said, is that that's not, her bringing it upon herself, that isn't necessarily a good argument. That's not appropriate to consider because then everyone who comes into the court wanting to relocate, they put themselves in this situation, they have to deal with the consequences. And I don't think that's appropriate. So, Your Honors, Mr. Boston has begun a new life with his new wife, her son, and their daughter together. My client wishes to do the same. And to achieve this, obviously she has to relocate. And the trial court, if a parent can't relocate in a case like this, the trial court's standard has made it impossible for any parent to relocate in the future. And that's what I think makes it unreasonable. That's what I think makes it manifestly unjust. And what I think makes it against the manifest weight of the evidence. Thank you. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall issue.